[Hollingsworth v. Hollingsworth.]

# Hollingsworth *v.* Hollingsworth's Executors.

*Bill in Equity by Executors, for Construction of Will.*

65   321
98   433

1. *Rules of construction, as to general and special intent, and as to implied provisions.*—It is a leading canon in the construction of wills, that a special intent must yield to the general intent, where there is an apparent repugnancy between the two; and another rule, equally imperative, forbids that provisions not expressed shall be supplied or incorporated, except where an intention to that effect appears by clear and necessary implication from the provisions which are expressed.

2. *Property to be converted into money by sale.*—When the will directs property to be sold, and debts to be collected, and makes no special disposition of the proceeds, they will be treated as other moneys in the final distribution.

3. *Government bonds purchased after execution of will.*—Where the testator directs "all the money on hand" at the time of his death to be invested in government bonds, and makes a purchase of such bonds after the execution of his will, the bonds so purchased will be considered as a partial execution of his declared intention, and will be classed with the bonds purchased by the executors.

4. *" Winding up of business," by one of several executors.*—Testator was engaged in carrying on a large mercantile business, and had a large amount of debts due him. He appointed his sons-in-law and his widow as executors, and instructed them to sell out the stock of goods on hand, on specified terms, taking good security for the purchase-money; and by a subsequent clause, directed an inventory to be taken of all debts due to him, as well as of debts owing by him, and a copy of this to be furnished to each of the executors; adding, " W. P. L." [one of the executors] "is hereby charged with the winding up of the business; and, after paying all the debts I owe, then the money, as fast as it is collected to the amount of $500, must be deposited in bank"; further providing, that his acts should always be open to the inspection of the other executors, and, if he did not "act justly in the collections, payment of debts, and depositing of funds," that he should be dismissed, and another one of the executors should take his place; specifying the compensation per day which he should receive, and directing the executors to employ a competent person to "assist him in winding up the business." *Held*, that the *business* thus intrusted to L. was only the collection of the outstanding debts growing out of his mercantile business.

5. *Provisions as to investments in government bonds, deposits in bank, and final distribution of money.*—Where the will directed " *all the money on hand,*" at the testator's death, to be invested in government bonds, and the surplus interest arising from them, after defraying family expenses, to be re-invested in the same way; that moneys collected from the outstanding debts due him as a merchant, which amounted to a large sum, after payment of his debts, "as fast as it is collected to the amount of $500, must be deposited in bank;" and, by a subsequent clause, that " *all the money* shall, at some time during the year 1890, be divided among " his wife and children, and that the real estate should be divided in 1891; *held*, that the deposits in bank, arising from the collections, were not required to be invested in government bonds, and were not subject to distribution as in case of intestacy; nor were they to lie idle in bank until the final distribution, but should be made productive in the meantime, under the instructions and guidance of the court, at lawful interest, and should be distributed in 1891, with the bonds, as part of " all the moneys."

[Hollingsworth v. Hollingsworth.]

6. *Meaning of " children."*—Where the will directed that the testator's widow should be allowed to take, from his stock of merchandise directed to be sold, " such articles as she may want, and to any amount, for her use and the use of the *children* " ; that the annual rents of the real estate, until the time appointed for the final division and distribution, should also " be turned over to her, for the support of her and the *children*," besides an additional sum, "from other sources, to amply support her and the *children,* and for the education of the children that have not been educated " ; that all the money, proceeds of sale, &c., should be equally divided among his wife and children in 1890, and the real estate in 1891, after first giving to the younger children each a sum equal to that already advanced to the two oldest ; *held,* that the provisions for the use and benefit of the children, before the final distribution, were intended for all equally, and were not confined to those who were or continued to be members of the family.

APPEAL from the Chancery Court of Etowah.
Heard before the Hon. H. C. SPEAKE.

The bill in this case was filed on the 21st October, 1879, by the executors and executrix of the last will and testament of William D. Hollingsworth, deceased, against the several legatees and devisees therein named ; and sought a judicial construction of the will, and the instructions of the court for the guidance of the complainants in the discharge of the duties imposed on them by the will. The testator died on the 25th April, 1879, in said county of Etowah, where he had resided for many years ; and his last will and testament, which was dated the 16th April, 1878, was there duly admitted to probate. The will contained the following provisions :

"Sec. 1. I want all my just debts paid, out of the debts that are due me, as fast as they can be collected by the executors and executrix of this my will.

"Sec. 2. I want the merchandise that I may have on hand to be sold to merchants, if possible, on a credit of one-third on six months, one-third on nine months, and one-third on twelve months ; the goods to be sold at cost, and the debts well secured by mortgage or personal security. If this can not be done, then they must be auctioned off on credit. All men purchasing must make the payment secure beyond a doubt. My dear wife first to be allowed to take from the stock such articles as she may want, and to any amount, for her use and the use of my children.

"Sec. 3. I want all the land and town property that I may be possessed of to remain in its present condition, and rented out every year, and the proceeds to be turned over to my dear wife, for the support of her and my children. My dear wife to receive annually a sufficient amount of money, from other sources besides the rents, to amply support her and our children, and for the education of the children that

have not been educated; the amount of money to be governed entirely by the necessities of their wants.

"Sec. 4.  I want all my money on hand to be invested in government bonds, and have them registered, and put in a safe deposit; and the interest on said bonds, after paying all family expenses, to be re-invested in United States bonds; and money needed for immediate expenses, if it can not be raised from my business, must be retained out of money on hand.

"Sec. 5.  If any creditor is not satisfied with the manner in which he is to get his pay, then pay him at once.

"Sec. 6.  On the first Monday in November, 1891, I want all my land divided equally among my children; but none of it to be sold, except to one another; and if my wife shall be living at that time, she is to retain all the town property in Gadsden her life-time, and to have, in addition thereto, the amount of one thousand dollars a year in cash, if she shall want it; if she shall not be living at that time, then all the town property to be divided equally among all my children, after first giving to each one the amount, to make them equal to Annie and Laura, of twelve hundred dollars.

"Sec. 7.  I hereby constitute and appoint W. P. Lay, John S. Paden, James Aiken, and my beloved wife, as my executors of this, my last will, and earnestly request them to carry it out.  I want an inventory of my debts taken at once, in and by name, to say who owes, and how much; and a copy of this must be furnished to each one of my executors named, and also a list of the amount that I may owe, and to whom. Mr. W. P. Lay is hereby charged with the winding up of the business; and, after paying all the debts I owe, then the money, as fast as it is collected to the amount of $500, must be deposited in bank.   W. P. Lay's work and actions to be at all times open to inspection to the other members of the executors; and if he shall not act justly in the collections, payment of debts, and depositing of funds, then he must be dismissed, and John S. Paden take his place.  He is not to be responsible for any thing that does not go into his hands, and for this service he shall receive $2.50 per day.  My executors are hereby directed to employ J. T. Martin, or some other man who is equally as good, to assist W. P. Lay in winding up the business; and I here direct, that the collections be made as I have always proceeded to collect—that is, do the best you can, and purchase cotton as far as the parties owe, but no further—no speculation: *sell at once*.  John T. Martin is worth, in this business, $50 per month.

"Sec. 8.  No bond required from any one of the execu-

[Hollingsworth v. Hollingsworth.]

tors. In case of bad and doubtful debts, compromises are authorized, but only by the consent of all my executors, and the amount agreed upon. Monthly comparisons shall be made, and checked out on each sheet, so that all parties may see and know just how the business is progressing.

"Sec. 9. R. B. Kyle is hereby given the full control of the lawsuit with East Alabama and Cincinnati Railroad. What he may do, is to be satisfied, as I have full confidence in his management; he being required to pay over the amount he receives for me, which is one-half of the amount that may be collected.

"Sec. 10. My beloved wife to retain her horses, carriage, hogs, cattle, piano, and all household furniture. The amount that may be paid on my life-insurance may be disposed of as follows : one-sixth to each child, the money of those that are under age to be invested in United States bonds. My daughter Katie is to have the two lots between the lots and the railroad, bought yesterday of R. B. Kyle; and she is to have one thousand dollars, which shall be spent in building a house on said lot, to make her equal with Laura and Annie.

"Sec. 11. At some time during the year 1890, all the money shall be divided among my wife and children.

"Sec. 12. If my beloved wife shall marry (which I hope she will not), then she is not to have any share at the final division of the money, but may retain the town property during life only. I have now in cash, in the hands of Berrys & Co. $16,000, Hopkins, Dwight & Co. $14,000, First Nat. Bank of Rome, Ga., $3,000—$33,000, or very near these amounts."

The testator left six children—namely, Mrs. Laura J. Lay, the wife of said W. P. Lay; Mrs. Annie D. Paden, the wife of said John S. Paden; Mrs. Katie M. Standifer, the wife of Walter S. Standifer when the bill was filed, but the record does not show whether she was married before or after the testator's death; Willie A., and Edward Tracy, whose ages were alleged to be between fourteen and twenty-one years each; and Mary Alice, who was under fourteen years of age when the bill was filed. All the persons named as executors qualified, and joined as complainants in the bill. The bill alleged that the testator, at the time of his death, owned a United States bond for $5,000, which he had purchased on the 10th June, 1878; also, ten shares of stock in the Commercial Fire Insurance Company at Montgomery, Alabama, of $100 each, which he had taken in 1877, and on which he had paid twenty per-cent. installments; "also, a large sum of money, to-wit, about $100,000, due and owing to him by

[Hollingsworth v. Hollingsworth.]

deeds of trust, mortgages, crop-liens, bonds, promissory notes, and accounts from third parties," of which the complainants had collected, when the bill was filed, about $1,350, "over and above what is necessary for the payment of debts, funeral expenses," &c. The bill alleged, also, that in February, 1879, the testator joined with other persons in organizing a corporation for the purpose of engaging in the manufacture of lumber at Gadsden, called the Southern Lumber Company; that this corporation had acquired considerable property, real and personal, and the testator's interest in it was worth about $4,000, besides a debt of $600 which the corporation owed him; that the testator had on hand, at the time of his death, "cash on deposit to the amount of about $27,400," which the complainants had invested in United States bonds, as required by the fourth section (or paragraph) of his will; that he also had on hand a large stock of goods, wares and merchandise, at Gadsden, where he was then carrying on business as a merchant, which the complainants had sold, under the second item of the will, "on the terms of credit therein specfied, for about $12,000, and secured by mortgage;" that his real estate, which was particularly described, was worth in the aggregate over $20,000, and its annual rental value was more than $1,500; and that $7,000 had been collected on the policies of life-insurance, and divided between the widow and children according to the provisions of the will.

The bill alleged that doubtful and perplexing questions had arisen, touching the complainants' duties in the execution of the trusts imposed by the will, and asked the instructions of the court on the following points: "1. What disposition is to be made of said $5,000 bond, and the interest thereon? Must it be presently distributed among the said heirs at law? or must it be retained until some time in the year 1890, and then distributed according to the tenth section of the will, and the interest that is not needed for the support of the testator's widow and children, and the education of the children, under the 3d section of the will, to be invested in United States bonds? 2. As to the stock in the said insurance company: did the testator die intestate as to that? What disposition must be made of it under the will? 3. As to the moneys realized from the collections aforesaid of the debts due and owing to the testator at his death, and proceeds of the sale of said stock of goods, and the sum to be realized from the testator's interest in said corporation: Are these sums, or either of them, and which, if not all, to be presently distributed among the said heirs at law and the widow? or are they to be be invested in United States

bonds, under section four of the will, and distributed in 1890, under the tenth section of the will? or are they to be disposed of under the seventh section of the will, in a different mode and manner from either of the above?"

There was no disputed question of fact in the case. A joint answer was filed by all the adult defendants, admitting the allegations of the bill, and submitting the legal questions to the decision of the court; and a formal answer was filed by the guardian *ad litem* of the infant defendants. On final hearing, on pleadings and proof, the chancellor delivered an opinion and decree, in which he said : " The stock in the insurance company, mentioned and described in the bill, is undisposed of by the will, and, hence, will be administered under the law governing the estates of intestate decedents. After the payment of his debts, the support of his wife and minor children, and the education of his minor children, the leading intention of the testator was to have his estate so managed that it would be safe, and secure, and in such way invested that in 1890, the time fixed by him for division, it could, with its accumulations, be easily divided among those entitled to it under the will. In order to carry out this intention, he selects for himself the character of investments to be made in United States bonds registered, and all other directions by him made must succumb to this general intention; and in fact all the suggestions by him made tend to show that he desired his property to be so invested as to accumulate more, but to be safely invested. It can never be supposed that he intended, as fast as $500 was collected, that it should be deposited in bank, and there remain for ten years. This can only be construed as a direction by him to his executors, as a safe mode by which they could keep the money, until invested to carry out his general intention. The purchase of the United States bond, after the making of the will, was the beginning of the carrying out of the plan by himself in life, that he had intended for his executors to follow after his death." He therefore decreed accordingly, and ordered the cause to be retained on the docket for future action.

All the defendants appeal from the decree, and here assign it as error.

S. K. McSpadden, and Thos. H. Watts, for appellants.

Aiken & Martin, *contra.*

STONE, J.—In construing wills, it is our duty to carry into effect the intention of the testator, shown in the words

he employs, unless that opinion contravenes some rule of law, or public policy. There is no rule of law, or of public policy, violated by any intention shown in the will of Mr. Hollingsworth, to obtain a construction of which this bill was filed. A second leading canon, by which wills are interpreted, is, that, in case of apparent repugnancy, the general intent of the testator, as disclosed in the will, shall be preferred to the special intent; and to this end, it is our duty to consult the entire will in all its parts, in arriving at a proper interpretation of its several provisions. A third rule, not less imperative, is, that under a pretence of interpretation we can not incorporate provisions, not expressed in the will, unless the will itself proves such to have been the intention of the testator, by clear and necessary implication; necessary, to give to the will operation according to the manifest intent of the testator. In *Sherrod v. Sherrod*, 38 Ala. 537, WALKER, J. said : "The court can not resort to conjecture, when the terms of the will are of intelligible import. To do so, would be to make a will, conforming to what is supposed the testator intended—not to search for the intention in the construction of what is said. It is not the province of a court to incorporate into a will provisions which it may be supposed the testator would have adopted, if they had occurred to him. Nor is it the province of the court to provide for a contingency, neglected in the will, because there is room for conjecture that the testator would have done so, had he anticipated it." These propositions are well supported by authorities. In that case, there were two opinions delivered, reaching the same conclusion, and citing many authorities, showing the danger of going beyond the express terms of a will, in search of a supposed or implied intention in the testator.

The will of Mr. Hollingsworth was evidently drawn without legal advice. It is obscure and incomplete in many of its provisions, and it is difficult to give it a satisfactory interpretation. The rents from his real estate, and the sum to be realized on his life-policies, he so disposes of, as to raise a necessary implication that he intended no delay in their distribution. The former he directed to be turned over to his wife," for the support of her and my [testator's] children," and she " to receive annually a sufficient amount of money, from other sources besides the rents, to amply support her and our children, and for the education of the children that have not been educated." He directs the distribution of the life-policy money, and names no time when it is to take place. The land rents are evidently to be turned over as they accrue, and the additional "sufficient amount of

money from other sources," as it may be wanted, or, at least, annually. The life-insurance money to be distributed when realized. He directs, as we shall hereafter show, the expenditure of one thousand dollars, in erecting a house for his daughter Katie, and the employment of money in the payment of his debts, should any of his creditors be unwilling to wait until sufficient collections could be made for their payment. These sums, we repeat, were not to be delayed in their disbursement, as the will plainly shows, either by express direction, or by necessary implication. With the exception of the above, the will is silent, as we shall hereafter show, on the subject of division or distribution, save in two clauses; one, directing a division of the money in 1890; the other, a division of the land in 1891.

In construing the clauses of this will which direct distribution, we shall treat the merchandise on hand, and the collectible dues, as money, for the will directs them to be converted into money.—1 Story's Equity, § 791; *Hemphill v. Moody*, at the last term.

No difficulty or misunderstanding can arise in the proper construction of the items or sections of the will, numbered 1, 2, 5, 6, 8, 9, 10, 12. These seem to be plain and unambiguous, and we will devote no time to them. The difficulties arise in the construction of the other sections. We postpone the farther consideration of section 3, until we dispose of the others. Section 4 may be construed by itself. It is, in terms, limited to "all my [testator's] money in hand." This money was to be invested in government registered bonds. The purchase, after the execution of the will, of the five thousand dollar government bond, must be treated as a part execution, by the testator himself, of this testamentary purpose, to so invest his money in bonds. That bond stands, in all respects, in the category of the bonds purchased by the executors under clause (or section) 4 of the will, to be distributed, or turned over to the legatees, when *they* are distributed or turned over.

Section 7 of the will declares that W. P. Lay, one of the executors, "is hereby charged with the winding up of the business." What is comprehended in the phrase, "the business," is a material inquiry. Testator was a merchant, doing a large business. He had on hand, at the time of his death, a stock of goods worth, at cost prices, twelve thousand dollars, and sold by the executors for about that sum. Section or item 2 of the will directed in what manner this merchandise should be disposed of. Its language is: "I want the merchandise that I may have on hand to be sold to merchants, if possible, on a credit of one-third on six

months, one-third on nine months, and one-third on twelve months, the goods to be sold at cost, and the debts well secured by mortgage, or personal security." The bill informs us that this direction was carried out, and that the goods were so sold. This, we are convinced, was a duty cast on all the executors, and is not to be included in the general description, 'the business,' the winding up of which is committed to W. P. Lay, in section 7 of the will. The clause of section 7 which immediately precedes this special delegation of authority to W. P. Lay, is in the following language: "I want an inventory of my debts [claims) taken at once, in and by name, to say who owes, and how much; and a copy of this must be furnished to each one of my executors named, and also a list of the amount that I may owe, and to whom." Then comes the commisssson to Lay, to wind up the business. Immediately after this is the clause: "and after paying all the debts I owe," then to be deposited, &c. The first item or section of the will is in this language: "I want all my just debts paid, out of the debts that are due me, as fast as they can be collected by the executors and executrix of this, my will." A further clause in section 7 is as follows: "I here direct that the collections be made as I have always proceeded to collect—that is, do the best you can, and purchase cotton so far as the parties owe, but no farther—no speculation: *sell at once.*" Section 8 is in this language: "No bond required from any one of the executors. In case of bad and doubtful debts, compromises are authorized, but only by the consent of all my executors, and the amount agreed upon. Monthly comparisons shall be made, and checked out on each sheet, so that all parties may see and know just how the business is progressing." "The business," the winding up of which was committed to W. P. Lay, was the uncollected dues to Mr. Hollingsworth, growing out of his mercantile transactions, and nothing else. This "business," is described in the bill as "a large sum of money, to-wit, about $100,000, due and owing him by deeds of trust, mortgages, crop-liens, bonds, promissory notes, and accounts from third parties."

In the 7th section, or item of the will, immediately succeeding the clause which charged Lay "with the winding up of the business," he is directed, "after paying all the debts I [testator] owe," to deposit the money in bank, as fast as it is collected to the amount of five hundred dollars. There is no other direction in the will as to what is to be done with the money thus collected, unless it falls under some of the general clauses hereafter referred to. The chancellor ruled, and so ordered, that under the directions of the will, this

[Hollingsworth v. Hollingsworth.]

fund, like the money on hand at testator's death, was to be invested in government bonds, under section 4 of the will. In this, we think the chancellor erred, because there is not a word or syllable in the will, showing such intention on the part of the testator. There are two clauses of the will which direct investment in government bonds. The first is item 4, commented on, and construed above. It authorizes, and only authorizes, the investment of money on hand: "All my money on hand," is its language. The other direction or authority is in section 9, and refers expressly to the life-insurance money. Its language is : " The amount that may be paid on my life-insurance may be disposed of as follows : One sixth to each child, the money of those that are under age to be invested in United States bonds." Now, these quotations from the will show that the mind of the testator was directed to the subject of investing in such bonds ; he knew how to express such directions ; he did expressly direct such investment of certain specified funds, and omitted such direction as to all other funds. *Expressum facit, cessare tacitum.* We think, on all fair rules of construction, there is both a want of express authority in the will, and of a necessary implication from its other provisions, to invest the moneys arising from " the business," in government bonds. We do not say the will shows the testator did not so intend. There is simply a failure to show by express direction, or by necessary implication, that such was his intention. He may have been averse to investing all his personal effects in one species of security. We are construing the will, not making it. What is to be done with this money, after it is deposited in bank, under section or item 7 of the will, we leave for consideration further on.

Section or item 11 is as follows : " At some time during the year 1890, all the money shall be divided equally among my wife and children." This is the entire item, and it does not, by juxtaposition or otherwise, so connect itself with any other provision of the will, as to derive therefrom any special aid in its interpretation. We must construe this item by its own words, aided by the general purpose and intent, gathered from the whole will. What is meant by the expression, " all the money ? " If we confine this expression to actual money—cash that may be in hand in 1890— at the very greatest stretch, we limit its operation to the money to be realized from the suit against the East Alabama and Cincinnati Railroad Company, the proceeds of the sales of the merchandise, and the collections to be made from " the business," less the sum to be expended in paying the testator's debts, and in supplementing a support for the widow and

children. The lands had been ordered to remain as lands; the money on hand at testator's death had been ordered to be invested in government bonds; the life-insurance money was to be distributed when realized; and the rentals were to be paid to the widow, in part maintenance of herself and children. There was, therefore, nothing left that could be technically called money, except the sum of the sale of the merchandise, and the collections from "the business," and the product of the suit referred to.

There is another formidable difficulty in the way of this construction. The will, in section 5, makes provision for the division of the lands in 1891, and for the distribution of the life-insurance money when it is collected; and there is no other section or clause of the will, except section 11, copied above, which provides in any manner for division or distribution. There is, in the will, no clause in its nature residuary; and, confining section 11 to *actual* money, leaves an intestacy as to the final disposition of the government bonds. It may be urged, that inasmuch as government bonds are not technically money, there can be nothing unreasonable, or opposed to the provisions of the will, in adjudging an intestacy as to those bonds; thus leaving them for early distribution, without waiting for the time prescribed in section 11. This leaves section 4 of the will without aim or object; for testator could have had no sensible reason for investing his money in bonds, to be immediately distributed to his children, and in all likelihood sold, as a necessary means of making equal division. Moreover, he directed them to be kept at interest, and "the interest on said bonds, after paying all family expenses, to be re-invested in United States bonds." We are satisfied the testator intended the bonds to be retained without division, until 1890. We think the clauses of the will contain a necessary implication that the bonds were to be distributed in 1890; and inasmuch as this can not be accomplished without giving to the word *money*, in section 11, a broader significance than mere cash in hand, we hold the testator intended thereby, not only the money that might be on hand, but all investments of money under the directions of the will, that should stand in the place of, and be convertible into money.—2 Williams on Executors, 1025.

Section 7 of the will, after charging W. P. Lay with the duty of winding up the business, contains this clause: "After paying all the debts I owe, then the money, as fast as it is collected to the amount of $500, is to be deposited in bank." Here the direction stops, without a word of instruction as to its disposition or custody afterwards. This

is one of the questions upon which instructions of the court are sought. It will be seen, by observing the context, that this direction relates to the moneys collected in "winding up the business," and no such directions are given in reference to any other moneys to come into the hands of the executors. The sources brought to view in the will, from which other money would be realized, are the sale of the stock of merchandise on hand, and the pending suit against the East Alabama and Cincinnati Railroad Company. It is contended for appellant, that the testator could not have intended that this money should remain idle and unproductive until 1890, liable to be lost by a failure of the bank; and inasmuch as the will gives no express direction for taking the money out of bank, testator must have intended it for early distribution. It is a well-known fact, that the average man is hopeful—perhaps, too hopeful. Many men, having money in their possession, whether their own or not, will spend it, or use it in business or speculation, confidently expecting to replace it when wanted. This is the fruitful source of most of the melancholy defalcations, official and otherwise, of which we hear so much. Mr. Hollingsworth's business qualifications, and the connection in which this direction to deposit is given, convince us that he was influenced by these considerations, in guarding against too great an accumulation of money in private or individual hands. We do not think he intended that the money should remain on deposit in bank, until 1890. He has not *expressed* such intention in his will.

We think this will furnishes evidence of an intention on the part of the testator to keep the bulk of his estate together and undivided, until 1890-1. Another clause of the will tends to confirm this view. Section 6 of the will directs the lands to be divided on the first Monday in November, 1891; and, in the event of the death of his wife before that time, it directs the town lots to be divided at the same time. That direction is given in the following language: "If she [the wife] shall not be living at that time, then all the town property to be divided equally among all my children, after first giving to each one the amount, to make them equal to Annie and Laura, of twelve hundred dollars." We infer from this, that the testator had already advanced to his two daughters, Mrs. Paden and Mrs. Lay, to the amount of twelve hundred dollars each; and he here directs that a corresponding sum be paid to each of his other children, to make them equal. This, it will be observed, was not to be done until the division of the town lots, not to take place before November, 1891, in any event. Now,

[Hollingsworth v. Hollingsworth.]

why delay this equalization for so long a time, if a large part of the estate—the collections from the business, the sale of the merchandise, and the product of the law-suit against the railroad—was to be distributed at once, as contended by appellants? Some of the legatees thus to be equalized would, doubtless, attain to lawful age long before 1891; and it would seem but reasonable that the equalization should be made out of the first sufficient sum that passed into distribution. Yet the will directs this to be done, when the town lots are divided. We can not adopt this construction of the will. We hold that this fund, like the other money assets, must be kept together, subject to the charges upon it for maintenance, &c., until the general division of the money under the 11th section of the will. In the 10th item of the will, testator made provision for another of his children, Katie. This, we think, so far as she is concerned, must be regarded as execution by the testator, of the expressed intention to make his other children equal to the advance of twelve hundred dollars, he had made to Annie and Laura.

It results from what we have said, that the executors are left without testamentary direction as to the safe custody and employment of this large fund, during the relatively long time that must elapse, before it can be divided. It is manifest it should not remain unproductive. Minors are intested in this fund, and we think the chancellor should instruct the executors in the performance of this delicate and responsible trust. If he order it to be put to loan on private security, that security should be *generously* ample, and the interest collected annually, and lent out on like security. The security should be real, and not perishing in its nature; and if it be improved property, this should be kept under sufficient insurance to protect the loan, and the policy so framed or assigned, as that the money realized from the destruction or injury of the property, will enure to the executors. And no loan should be allowed on questionable titles. We do not, however, intend to be understood as affirming that the money shall be put to loan on private security. That depends, we think, very much on local wants and facilities, of which we have no knowledge or information. Neither are we to be understood as advising, on either side, as to investment in government securities. Productiveness, not exceeding lawful interest, should be the prime object, so far as it can be carried out with perfect security.

We come now to the consideration of section or item 3 of the will, which is in the following language: " I want all

the land and town property that I may be possessed of to remain in its present condition, and rented every year, and the proceeds to be turned over to my dear wife, for the support of her and my children ; my dear wife to receive annually a sufficient amount of money, from other sources besides the rents, to amply support her and our children, and for the education of the children that have not been educated. This amount of money to be governed entirely by the necessities of their wants. " When the testator executed his will, in 1878, two of his children, Annie and Laura, were married women ; another, Katie, must have nearly reached her majority, for in the will she is provided with lots, and a house to be erected thereon. In the bill, filed in October, 1879, Katie is described as Mrs. Standifer, a married woman. Another of the children, Willie A., is described in an affidavit to the bill, as a minor over fourteen years of age. The other two under fourteen. Now, what did testator mean by the word ' children, ' in this item of the will ? Did he mean all his children, or only such as constituted a part of his family ? And if the latter, was the provision which that item makes for *them*, to continue only so long as they remained members of the family ? It must be borne in mind that the oldest of the minors, Katie, would soon reach majority, and might marry and cease to be a member of the family. A second, Willie A., would become twenty-one before the year 1890, and she too might cease to be a member of the family. So, possibly, of one or both of the others. The term ' children ' is mentioned in other clauses of the will. In item 2, after giving direction for the sale of the merchandise, testator had added : " My dear wife first to be allowed to take from the stock such articles as she may want, and to any amount, for her use, and the use of my children. " Section or item 4, after directing the investment of the money on hand in government bonds, has this clause : " And the interest on said bonds, after paying all family expenses, to be re-invested in United States bonds, " &c. Section 6 directs : " On the 1st Monday in November, 1891, I want all my lands divided equally among my children, . . then all the town property to be equally divided among all my children, " &c. In section or item 9 is this clause : " The amount that may be paid on my life-insurance, may be disposed of as follows : one sixth to each child, the money of those that are under age to be invested in United States bonds. " In item 11 testator said : " All the money shall be divided equally among my wife and children. "

We have now copied every clause in the will, which

[Hollingsworth v. Hollingsworth.]

speaks of the testator's children, as children.    It will be observed that in one place—item 4—he uses the word *family*; and when he directs the division of the life-insurance money, he discriminates between the adult children, and those under age.   We come to the conclusion, that by the word children, in section 3 of the will, the testator intended to include all his children—those then constituting his family, and those who, by marriage, had ceased to be members of his family; the money for this purpose to be paid to Mrs. Hollingsworth, the widow, and by her disbursed. We think, in the matter of disbursement, the widow is clothed with a discretion; and that both she, in the administration, and the executors, in supplying her with money for the purpose, are, in the language of the will, "to be governed entirely by the necessities of their wants." Not mere physical wants; for their estate and condition in life, and the habits of testator when in life, should be reasonably consulted in determining what are the "necessities of their wants." Considering the various clauses of the will, we think the testator intended equal benefit and bounty to his children, except that those not educated were to have an additional allowance to pay for their education.   Our construction above accomplishes that end, and we think it necessary, alike to give to the word *children* a uniform and natural meaning, and to secure equality of distribution.

The administration of this estate is so complicated with trusts and continuing duties, that we advise its removal into the Chancery Court.

There is an intestacy as to the ten shares of stock in the Commercial Fire-Insurance Company in Montgomery, Alabama, and as to testator's interest or stock in the Southern Lumber Company, for manufacturing lumber at Gadsden, Alabama, and all that pertains thereto.   These parts of testator's estate must be administered as intestate estates are.

Reversed and remanded.